# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Matson Logistics, LLC,
f/k/a Matson America Transportation
Services, LLC

     Plaintiff,

  v.

Jeffrey D. Smiens; Patrick E. Lynch;
Global Logistics, LLC; Granite
Logistics Services, LLC; and Trinity
Logistics, Inc.,

    Defendants.

**MEMORANDUM OPINION
AND ORDER**

Civil No. 12-400 ADM/JJK

---

Eric Habig, Esq., and Braden K. Core, Esq., Scopelitis, Garvin, Light, Hanson & Feary, Indianapolis, IN, and Mark J. Ayotte, Esq., and Kevin M. Decker, Briggs & Morgan, PA, Minneapolis, MN, on behalf of Plaintiff.

Joseph W. Hammell, Esq., Sarabeth A. Ackerman, Esq., and Jennifer L. Cornell, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Defendants Jeffrey D. Smiens, Patrick E. Lynch, and Granite Logistics Services, LLC.

Jonathan K. Reppe, Esq., Reppe Law, PLLC, Northfield, MN, on behalf of Defendant Global Logistics, LLC.

David R. Crosby, Esq., Leonard, Street and Deinard, PA, Minneapolis, MN, on behalf of Defendant Trinity Logistics, Inc.

---

# I. INTRODUCTION

On April 30, 2012, the undersigned United States District Judge heard oral argument on

Plaintiff Matson Logistics, LLC's ("Matson") Motion for Preliminary Injunction [Docket No. 6]

("PI Motion"). The Court also heard oral argument on Defendant Trinity Logistics, Inc.'s

("Trinity") Motion to Dismiss [Docket No. 16] and Defendants Jeffrey D. Smiens ("Smiens"),

Patrick E. Lynch ("Lynch"), and Granite Logistics Services, LLC's ("Granite") Motion to

Dismiss [Docket No. 18].  For the reasons discussed below, Plaintiff's PI Motion is denied,

Defendant Trinity's Motion to Dismiss is granted, and the remaining Defendants' Motion to

Dismiss is granted in part and denied in part.

## II.  BACKGROUND

Plaintiff Matson is a transportation broker with headquarters in Ohio.  Compl. [Docket

No. 1] ¶¶ 1, 9.  Defendant Global Logistics, LLC ("Global"), is a limited liability company

organized in Minnesota, and its one member is Defendant Smiens, a citizen of Minnesota.

Compl. ¶ 4.  Defendant Granite is also a limited liability company organized in Minnesota with

two members, Smiens and Defendant Lynch, both citizens of Minnesota.  Id. ¶ 5.  Defendant

Trinity is a corporation organized in Delaware and with its principal place of business in

Delaware.  Id. ¶ 6.

On March 24, 2011, Matson entered into an agency agreement with Global for exclusive

agency services.  Id. ¶ 10.  Matson and Global signed a revised Agent Agreement in the

beginning of June 2011.  Id.; Compl. Ex. 1 ("Agent Agreement").  Smiens and Ricco Guzman,

both listed as owners of Global, signed the Agent Agreement with Matson.  See Agent

Agreement at 5.  Under the Agent Agreement, Global was expressly prohibited from acting "as

an agent for any other transportation broker or service provider" or "for Agent's own account."

Id. § 1.  Global was authorized to "perform Services exclusively for and on behalf of [Matson]."

Id.  The term of the Agent Agreement was to be five years with automatic additional one-year

extensions unless terminated by either party with written notice to the other party at least 120

days prior to the termination.  Id. § 13. The Agent Agreement included a confidentiality

requirement which prohibited Global from disclosing confidential information to anyone during

2

or after the term of the Agent Agreement.  Id. § 16.  Confidential information was defined to

include "[c]ost and pricing information, Matson America customer lists, vendor lists, and reports

or other documents . . . ."  Id.

The Agent Agreement also included a non-solicitation provision precluding Global from

"directly or indirectly, either individually or as a principal . . . solicit[ing] business, or

attempt[ing] to solicit business, in products or services competitive with products or services

sold by [Matson]."  Id. Ex. A § 1.  The non-solicitation provision was to be effective for the

entire duration of the Agent Agreement and for a period of 180 days following the termination of

the agreement for any reason.  Id.  The non-solicitation clause also allowed Global to exclude

existing customers to which the non-solicitation requirements would not apply, but Global listed

none.  See generally Compl. Ex. A.

At the request of Smiens, Matson and Global entered into contract re-negotiations on

August 29, 2011, but the parties failed to reach a new agreement.  Compl. ¶ 19.  At this meeting,

Smiens was accompanied by Lynch.  Id.  On September 7, 2011, Smiens and Lynch filed

Articles of Organization for Granite in Minnesota.  Id. ¶ 20.  Matson alleges that through early

December 2011, Smiens and Lynch continued using the Matson email addresses for their

business dealings as Granite, as well as the same phone numbers and group of employees.  Id. ¶

21.  When Matson's Vice President, Mark Christos, called Smiens' office on December 12,

2011, the individual who answered the phone identified the answering entity as Trinity.  Id. ¶ 23.

Smiens soon joined the call, and he informed Christos that he and Lynch were serving as agents

for Trinity.  Id.  Trinity is a direct competitor of Matson.  Id.  Smiens stated that Global had

"ceased operations" and that "neither Global nor Smiens was bound by the terms of the Agent

Agreement." Id. ¶ 24.  Smiens stated that he was serving as an agent for Trinity because of the failed re-negotiation on August 29, 2011.  Id. ¶ 23.

Global is not dissolved, nor has the Agent Agreement been terminated.  Id. ¶ 24.  Matson alleges that it lost a substantial number of customers when Smiens began serving as an agent for Trinity through Granite.  Id. ¶¶ 25–28.  On December 15, 2011, Matson sent a cease-and-desist letter to Global, Granite, and Trinity, but received no response.  Id. ¶ 30.  On February 15, 2012, Matson filed this lawsuit.

### III.  DISCUSSION

#### A.  Choice of Law

##### 1.  Minnesota Procedural Law Applies

In deciding conflict of law questions, a federal district court sitting in Minnesota applies Minnesota's conflict of law rules.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  In diversity cases, federal courts apply state substantive law.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  "[P]arties may agree that the law of another state shall govern their agreement and [Minnesota courts] will interpret and apply the law of another state where such agreement is made."  Milliken & Co. v. Eagle Packaging Co., Inc., 295 N.W.2d 377, 380 n.1 (Minn. 1980).  However, "matters of procedures and remedies [are] governed by the law of the forum state."  Davis v. Furlong, 328 N.W.2d 150, 153 (Minn. 1983).  "[G]eneral choice of law provisions, as expressed in contracts, incorporate only substantive law, and do not displace the procedural law of the forum state."  Fredin v. Sharp, 176 F.R.D. 304, 308 (D. Minn. 1997).  Minnesota courts apply Minnesota law concerning procedure.  Schwan's Sales Enter., Inc. v. SIG Pack, Inc., 476 F.3d 594, 595–96 (8th Cir. 2007); see also Davis, 328 N.W.2d at 153 ("We

hold that when conflicts of procedure arise, the *lex fori* is to be applied.").  For a choice of law provision to require another state's law to govern procedural matters, the parties must expressly state that the choice of law provision extends to procedural matters; otherwise, the forum state's procedural laws apply.  Schwan's Sales Enter., Inc., 476 F.3d at 596 (citing U.S. Leasing v. Biba Info. Processing Servs., 436 N.W.2d 823, 825–26 (Minn. Ct. App. 1989)).

Here, the Agent Agreement specifies that the "interpretation, construction and enforcement of this Agreement will be governed by the laws of the State of Ohio exclusively, without reference to the laws of any other state or country . . . ."  Agent Agreement § 20(d).  Because the presumption is that a forum state's procedural laws apply, and because the Agent Agreement does not expressly state that Ohio procedural law applies, Minnesota law governs procedural law in this dispute.

## 2.  Substantive Law

Under Minnesota's choice of law analysis for substantive law, courts first look to whether there is an actual conflict between the law of two states.  Myers v. Gov't Emp. Ins. Co., 225 N.W.2d 238, 241 (Minn. 1974).  Both Matson and Defendants agree that Ohio and Minnesota law are in actual conflict as to claims regarding successor liability and misappropriation of trade secrets.  Because a conflict exists between the substantive laws of Ohio and Minnesota, the choice of law analysis must determine which law applies.

The next step in Minnesota's choice of law analysis is the application of the following five factors: (1) predictability of result; (2) maintenance of interstate order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) the better rule of law.  Milkovich v. Saari, 203 N.W.2d 408 (Minn. 1973).  Predictability of result weighs

strongly in favor of applying Ohio law here because the parties expressly agreed to be governed by Ohio law in the Agent Agreement.  This <u>Milkovich</u> factor aims for the ideal that "litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping."  <u>Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.</u>, 604 N.W.2d 91, 94 (Minn. 2000).  Predictability is enhanced where the parties get the "benefit of their bargain" regarding choice of law.  <u>Medtronic, Inc. v. Advanced Bionics Corp.</u>, 630 N.W.2d 438, 454 (Minn. Ct. App. 2001).  The intent of this factor is to safeguard the "justified expectations of the parties to the transaction."  <u>Id.</u> (citation omitted).  As such, predictability of results favors the enforcing the choice of law provision of the Agent Agreement and applying Ohio law to substantive issues.

Maintenance of interstate order does not weigh in favor of either Minnesota or Ohio law. The primary consideration under this factor is whether the application of Minnesota law would "manifest disrespect" for Ohio's sovereignty or stymie interstate commerce.  <u>Jepson v. Gen. Cas. Co. of Wis.</u>, 513 N.W.2d 467, 471 (Minn. 1994).  Since both states have an interest in applying their state laws, this factor is nonconclusive.

Simplification of the judicial task always favors the forum state, but Minnesota courts are presumed to be "fully capable of applying the law of another state."  <u>Medtronic</u>, 630 N.W.2d at 455.  Therefore, this factor does not strongly favor the application of either state's law over the other.  The fourth <u>Milkovich</u> factor analyzes whether a Minnesota forum court is being "called upon to apply rules of law inconsistent with Minnesota's concept of fairness and equity."  <u>Id.</u> at 455 (quotation omitted).  While "Minnesota's governmental interests will most clearly be advanced by application of Minnesota law," <u>id.</u> (citing <u>Wille v. Farm Bureau Mut. Ins. Co.</u>, 432 N.W.2d 784, 786 (Minn. Ct. App. 1988)), applying Ohio law does not materially reduce the

protection afforded under Minnesota law.  Both Minnesota and Ohio law permit restrictive

employment covenants, although both view them with disfavor.  Accord Jim W. Miller Const.,

Inc. v. Schaefer, 298 N.W.2d 455, 458 (Minn. 1980) ("[Minnesota courts] have consistently

taken a cautious approach to the question whether to permit an employer to enforce a restrictive

covenant in an employment contract.  [Restrictive] covenants are looked upon with disfavor

because their enforcement decreases competition in the marketplace and restricts the

covenantor's right to work and his ability to earn a livelihood.") and Ohio Urology, Inc. v. Poll,

594 N.E.2d 1027, 1031 (Ohio Ct. App. 1991) ("The law does not favor restrictive covenants.

The rule of reason reflects this as these covenants, despite freedom of contract, are enforceable

only insofar as they protect some legitimate interest of the employer.").  Accordingly,

Minnesota's governmental interests would likely be advanced by applying either Minnesota or

Ohio law, although this factor weighs slightly in favor of the application of this forum's law.

Courts rarely apply the fifth Milkovich factor of determining which state has the better

law.  See Nodak Mut. Ins. Co., 604 N.W.2d at 96 (stating that Minnesota courts have "not placed

any emphasis on this factor in nearly 20 years").  Courts apply this final factor "only when the

choice-of-law question remains unresolved after the other factors are considered."  Medtronic,

630 N.W.2d at 455–56.  Because predictability of result weighs heavily in favor of enforcing the

parties' contractual agreement, and because the remaining Milkovich factors are neutral or only

weigh slightly toward applying Minnesota law, Ohio law should apply to the substantive

contractual issues in this dispute.

Tort claims, however, do not automatically fall under the Agent Agreement's choice of

law provision.  See, e.g., Inacom Corp.v. Sears, Roebuck & Co., 254 F.3d 683, 687 (8th Cir.

2001) (holding that a contractual choice of law provision was "not broad enough to govern the choice of law for the fraudulent concealment claim, which sounds in tort").  A narrowly tailored contractual choice of law provision applies to contract claims as well as tort claims "closely related" to the terms of the contract.  Nw. Airlines, Inc. v. Astraea Aviation Svcs., Inc., 111 F.3d 1386, 1392 (8th Cir. 1997).  Tort claims are "closely related" to the contractual terms if the Court would need to interpret the contract to resolve the tort claim.

Neither Matson nor Defendants argues that Ohio law applies to the claims of tortious interference with contractual relationship and tortious interference with prospective advantage.  Rather, both agree that Minnesota law applies.  See Defs.' Mem. in Supp. of Mot. to Dismiss [Docket No. 24] at 24 n.17, and Pl.'s Mem. in Opp'n to Trinity's Mot. to Dismiss [Docket No. 34] at 11.  Thus, this Court will apply the law of Minnesota to these claims.

### B.  Defendants' Motions to Dismiss

#### 1.  Standard of Review

A motion to dismiss for failure to state a claim is governed by Rule 12 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(6).  In considering a Rule 12(b)(6) motion, the court views the pleadings in the light most favorable to the nonmoving party and treats the alleged facts as true.  See Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Conclusions of law made by the nonmoving party, however, are not "blindly accept[ed]."  Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).  A Rule 12(b)(6) motion to dismiss is granted when the factual allegations, even assumed to be true, do not entitle that party to relief.  See, e.g., Taxi Connection v. Dakota, Minn. & E. R.R. Corp., 513 F.3d 823, 826-27 (8th Cir. 2008).

Pleadings must "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Rule 8(a) has been interpreted to mean that a pleading must allege "enough facts to state a claim of relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). To satisfy the standard of facial plausibility, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). This plausibility determination is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'shown'—'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

### 2. Defendants' Motion to Dismiss

Defendants Smiens, Lynch, and Granite move to dismiss all Matson's claims against them. Each cause of action is treated individually below.

### a. Breach of Contract Claim against Smiens and Granite

Ohio law governs Matson's claim of breach of contract against Smiens and Granite. Under Ohio law, a breach of contract claim requires the following elements: (1) existence of a valid contract; (2) performance of contractual obligations by the non-breaching party; (3) defendant's failure to fulfill obligations without legal excuse; and (4) damages suffered by the non-breaching party as a result of this failure. Langfan v. Carlton Gardens Co., 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009). Ohio courts generally enforce "the long-held principle that . . . a signatory is bound by a contract that he or she willingly signed." Preferred Capital, Inc. v.

Power Eng'g Grp., Inc., 860 N.E.2d 741, 745 (Ohio 2007).  "It is axiomatic that the plaintiff must show that the defendant was a party to the contract before proceeding on a breach of contract theory."  Jackson v. Sunnyside Toyota, Inc., 887 N.E.2d 370, 375 (Ohio Ct. App. 2008).

Defendants Smiens and Granite assert that they are not parties to the contract, the Agent Agreement, and even if they were, Matson cannot show they breached the Agent Agreement's terms.  Matson counters that under a corporate veil piercing theory or successor liability theory, Smiens and Granite are parties to the Agent Agreement and are liable for a breach of that contract.  Although Smiens signed the Agent Agreement, he did so in his official capacity, signing as an owner or authorized corporate representative for Global.  See Agent Agreement at 5.  The parties in privity of the Agent Agreement were expressly listed as Matson and Global.  Under Ohio law, a contract is binding only upon the parties to the contract.  See Am. Rock Mechs., Inc. v. Thermex Energy Corp., 608 N.E.2d 830, 833 (Ohio Ct. App. 1992).  Moreover, nothing in the contract seeks to expressly impose the non-competition or confidentiality provisions on Smiens or Granite.  Because Count 2 of Matson's Complaint alleges that Smiens is liable for breach of contract on a corporate veil piercing theory and Count 3 claims that Granite is liable for breach of contract on a theory of successor liability, Count 1 alleging solely breach of contract fails as a matter of law as to Smiens and Granite — neither are signatories to the Agent Agreement.  As a result, Matson's breach of contract claim, Count 1, is dismissed as to Smiens and Granite.

**b.  Veil Piercing Claim against Smiens**

The parties dispute whether Ohio or Minnesota law applies to Matson's veil piercing claim against Smiens.  Both Minnesota and Ohio apply the internal affairs doctrine.  See, e.g.,

Hitachi Med. Sys. Am., Inc. v. Branch, No. 5:09-cv-01575, 2010 WL 816344, at *2–3 (N.D.

Ohio March 4, 2010) and Rupp v. Thompson, No. C5-03-347, 2004 WL 3563775, at *3 (D.

Minn. Mar. 17, 2004).  Under the internal affairs doctrine, "the law of the state of incorporation

normally determines issues relating to the internal affairs of a corporation."  Rupp, 2004 WL

3563775, at *3; see also Heine v. Streamline Foods Inc., 805 F. Supp. 2d 383, 389 (N.D. Ohio

2011) ("The internal affairs doctrine provides that the law of the state of incorporation governs

the internal affairs of a corporation.").  The rationale for the internal affairs doctrine is that "only

one State should have the authority to regulate a corporation's internal affairs-matters peculiar to

the relationships among or between the corporation and its current officers, directors, and

shareholders-because otherwise a corporation could be faced with conflicting demands."  Edgar

v. MITE Corp., 457 U.S. 624, 645 (1982).  The choice of law provision in an agreement is not an

exception to the internal affairs doctrine, and Ohio courts have applied the law of the state of

incorporation rather than a choice of law provision to breach of fiduciary duty claims.  Heine,

805 F. Supp. 2d at 390–393.

Courts have consistently applied the internal affairs doctrine to piercing the corporate

veil issues, reasoning that "the issue of piercing the corporate veil is collateral to and not part of

the parties' negotiations or expectations with respect to the contract."  Dassault Falcon Jet Corp.

v. Oberflex, Inc., 909 F. Supp. 345, 348 (M.D.N.C. 1995).  The Restatement (Second) of

Conflict of Laws states that "The local law of the state of incorporation will be applied to

determine the existence and extent of a shareholder's liability to the corporation for assessments

or contributions and to its creditors for corporate debts."  Restatement (Second) of Conflict of

Laws § 307.  Most courts have adopted this position and applied the internal affairs doctrine as

their choice of law for piercing the corporate veil.  See Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993) ("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders. . . ."); Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, 529 F.3d 371, 378 (7th Cir. 2008) (determining that under both Texas and Illinois law, "the law of the state of incorporation governs [veil piercing claims]"); Guinan v. A.I. duPont Hosp. for Children, 597 F. Supp. 2d 485, 495 (E.D.Pa. 2009) (applying the law of the state of incorporation to veil piercing claim); Tomlinson v. Combined Underwriters Life Ins. Co., No. 08-CV-259, 2009 WL 2601940, at *3 (N.D. Okla. Aug. 21, 2009) (finding that "the law of the state of incorporation determines whether a corporate veil may be pierced"); In re Bridge Info. Sys., Inc., 325 B.R. 824, 830–31 (Bankr. E.D. Mo. 2005) (applying the law of the state of incorporation to veil piercing claims).

Defendants cite Boyle v. Jacor Commc'ns, Inc., 799 F. Supp. 811 (S.D. Ohio 1992) to support their contention that in Ohio, choice of law provisions trump the internal affairs doctrine for veil piercing claims.  The Boyle court did apply Ohio choice of law rules and found that a choice of law provision stipulating New York law controlled a veil piercing claim rather than applying the internal affairs doctrine.  Id. at 813–14.  However, this Court is not convinced that this is the current state of the law in Ohio.  Specifically, the Heine court's more recent application of the internal affairs doctrine to a breach of fiduciary duty claim, rather than a choice of law provision, appears to accurately state the current law of Ohio on this point.  Heine, 805 F. Supp. 2d at 390–393.  Moreover, the facts and reasoning in Boyle are slim — the first paragraph of the opinion recites that "This is a complicated case [and] [n]either counsel has cited any law in support of their respective positions."  Boyle, 799 F. Supp. at 812.  Significantly,

Boyle was decided in 1992, years before the host of decisions applying the law of the state of incorporation to veil piercing claims. Given the near unanimity of courts in applying the internal affairs doctrine to veil piercing claims, and given the recent application of the internal affairs doctrine to an analagous issue in Heine, this Court is convinced that Ohio courts would apply the law of the state of incorporation to this veil piercing claim. Accordingly, Minnesota law applies to the veil piercing claim because Global is incorporated in Minnesota. Compl. ¶ 4.

"Piercing the corporate veil is an equitable remedy that may be applied in order to avoid an injustice." Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009). "A court may pierce the corporate veil to hold a party liable for the acts of a corporate entity if the entity is used for a fraudulent purpose or the party is the alter ego of the entity." Id. Under the alter ego theory of veil piercing, courts analyze the reality of corporate governance, not the form, examining the way the corporation actually operated and how the individual defendant related to that operation. Id. Minnesota courts apply a two-prong test to determine whether a shareholder may be liable for corporate obligations. The first prong focuses on the shareholder's relationship to the corporation, taking into account the following factors: (1) insufficient capitalization of the corporation; (2) failure to observe corporate formalities; (3) failure to pay dividends; (4) insolvency of debtor corporation at time of transaction; (5) siphoning of funds by dominant shareholder; (6) non-functioning of other officers and directors; (7) lack of corporate records; (8) existence of the corporation as a facade for individual dealings. Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979). The second prong requires the veil piercing be proven necessary to avoid injustice or fundamental unfairness. Id.

13

Matson has sufficiently pleaded its veil piercing claim.  Matson has met the first prong under the Victoria Elevator test, alleging that Smiens "siphoned funds from Global and redirected those funds for use in competing with Matson," that Smiens had Matson deposit Global payments directly to his personal bank account, that Smiens commingled Global funds with his own personal funds, that Global failed to maintain adequate corporate records or observe other corporate formalities, and that Global failed to pay dividends and was insufficiently capitalized.  Compl. ¶¶ 37–43.  Further, Matson has met the second prong of the veil piercing claim by alleging that Global's corporate form must be disregarded to avoid injustice and fundamental unfairness.  Id. ¶ 44.  Specifically, the facts in the Complaint sufficiently indicate the injustice of allowing Smiens to use Global as an alter ego and then create a new corporation – Granite – to avoid the obligations he owed to Matson under the Agent Agreement.  Given the sufficiency of Matson's stated claim of veil piercing under Minnesota law and facts sufficient to state a claim that is facially plausible, Smiens' motion to dismiss this claim is denied.

### c. Successor Liability Claim against Granite

Choice of law provisions do not govern successor liability premised upon implied assumption of liability.  See T.H.S. Northstar Assocs. v. W.R. Grace and Co.-Conn, 840 F. Supp. 676, 677–78 (D. Minn. 1993).   As stated previously, a federal district court sitting in Minnesota applies Minnesota's conflict of law rules.   Klaxon Co., 313 U.S. at 496.  While contractual claims are governed by Ohio law under a choice of law analysis, see infra Section III(A), claims regarding implied, rather than express or contractual, assumption of liability are governed by Minnesota law.   T.H.S. Northstar Assocs., 840 F. Supp. at 677–78 ("As the [successor liability

claim] does not arise from the agreement itself, it falls outside of the choice of law provision.").

In Minnesota, "where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor . . . ." <u>J.F. Anderson Lumber Co. v. Myers</u>, 206 N.W.2d 365, 368–69 (Minn. 1973).  Historically, four exceptions to this general rule of successor liability existed.  Prior to 2006, a successor corporation could be liable under the following exceptions: (1) where the purchaser expressly or impliedly agreed to assume liability; (2) where the transaction amounted to a consolidation or merger of the corporation; (3) where the purchasing corporation was merely a continuation of the selling corporation; and (4) where the transaction was entered into fraudulently in order to escape liability for such debts.  <u>Niccum v. Hydra Tool Corp.</u>, 438 N.W.2d 96, 98 (Minn. 1989).

Now, successor liability is governed by Minnesota statute, rather than common law.  In 2006, the statute was amended to expressly exclude the majority of these exceptions.  This statue states:

> The transferee is liable for the debts, obligations, and liabilities of the transferor only to the extent provided in the contract or agreement between the transferee and the transferor or to the extent provided by this chapter or other statutes of this state.  A disposition of all or substantially all of a corporation's property and assets under this section is not considered to be a merger or a de facto merger pursuant to this chapter or otherwise.  The transferee shall not be liable solely because it is deemed to be a continuation of the transferor.

Minn. Stat. § 302A.661, subd. 4.  The 2006 Reporter's Notes Minn. Stat. § 302A.661, subd. 4, provide even more clarity:

> This subdivision is amended to confirm the general rule that transferees of corporate assets are not liable for the obligations of their transferors . . . . Liability under these other statutes, such as Minnesota's environmental laws or the Minnesota fraudulent transfer act, is still possible, as is liability under federal statutes . . . Beyond these two explicit statutory exceptions, however, there are no common law exceptions to the rule of transferee non-liability . . . The newly

> added last sentence to this subdivision is designed to . . . confirm elimination of
> any common law exceptions, such as those employed under the rubrics of *de facto*
> merger or continuation of the transferor theories.  It clarifies that a purchase of all
> or substantially all of a corporation's assets is not a *de facto* merger and that the
> buyer is not liable for the seller's obligations solely because the buyer is deemed
> to be a continuation of the seller.

Whether the common law exception of implied assumption of liability remains is uncertain, since it was not expressly included or excluded under the amended Minn. Stat. § 302A.661, subd. 4.  Because the Reporter's Notes reflect that the Committee was attempting to curtail common law exceptions, and since no Minnesota statute expressly permits an implied assumption of liability from a selling to a purchasing corporation, it appears that the implied assumption of liability exception no longer applies.  But cf. Minn. Stat. § 176.051 (permitting implied assumption of workers' compensation liability for all agricultural employees if an agricultural employer procures a worker's compensation policy without specifically excluding any employees).

While the amended statutory language of Minn. Stat. § 302A.661 clearly abrogates the common law exceptions of de facto merger and mere continuation, the fraudulent transfer exception still exists.  Schwartz v. Virtucom, Inc., No. A08-1059, 2009 WL 1311816, at *2 n.2 (Minn. Ct. App. May 12, 2009); Quinn v. Elite Custom Transp. & Motorcoaches, LLC, Civ. No. 10-118, 2011 WL 1869391, at *8–9 (D. Minn. May 16, 2011).  The fraudulent transfer exception is governed by the Minnesota Fraud Transfer Act ("MFTA"), which provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) with actual intent to hinder, delay, or defraud any creditor of the
>> debtor; or
>> (2) without receiving a reasonably equivalent value in exchange for the
>> transfer or obligation, and the debtor:

16

(i) was engaged . . . in a business or a transaction for which the
remaining assets of the debtor were unreasonably small in relation
to the business . . . ; or

(ii) intended to incur, or believed or reasonably should have
believed that the debtor would incur, debts beyond the debtor's
ability to pay as they became due.

Minn. Stat. § 513.44(a).  In determining whether the debtor had actual intent to defraud, delay, or

hinder a creditor, the MFTA lists several relevant factors to consider, including whether the

transfer was to an insider, whether the debtor retained possession or control of the property after

the transfer, whether the transfer was concealed, and whether the transfer was of substantially all

the debtor's assets.  Minn. Stat. § 513.44(b).  A transfer under the MFTA means "every mode,

direct or indirect . . . of disposing of or parting with an asset or an interest in an asset, and

includes payment of money, release, lease, and creation of a lien or other encumbrance."  Minn.

Stat. § 513.41, subd. 12.  Claims brought under the MFTA must be pleaded with the specificity

required by Federal Rule of Civil Procedure 9(b).  Kranz v. Koenig, 240 F.R.D. 453, 455 (D.

Minn. 2007).  Under Rule 9(b), "a party must state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This heightened particularity standard

requires pleadings to allege the "who, what, when, where, and how" of the fraud.  United States

ex. rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006) (citation omitted).

Here, Matson's Complaint has pleaded fraud with the required specificity.  Matson

alleges that Smiens, on behalf of Granite, failed to disclose Granite's filing of Articles of

Organization with the Minnesota Secretary of State from September 7, 2011, to October 11,

2011.  Compl. ¶ 20.  Furthermore, the Complaint alleges that Granite, through Smiens, informed

Matson that it was incorporated simply to formalize a joint business venture, when in fact

Matson alleges Granite was acquiring the assets and employees of Global to serve as an agent for

17

a Matson competitor, Trinity.  Id.  Matson further alleges that Granite accomplished this fraud by disguising its activity by using the same emails, phone numbers, and employees as Global from October to early December 2011.  Compl. ¶ 21.  These facts sufficiently state the "who, what, when, where, and how" of the alleged fraud, and therefore Matson's claim for successor liability against Granite survives this Motion to Dismiss solely on the fraud exception.

### d.  Misappropriation of Trade Secrets Claim against Smiens

Under the Minnesota Uniform Trade Secrets Act ("MUTSA"), individuals are prohibited from the improper acquisition, disclosure, or use of a trade secret.  See Minn. Stat. § 325C.01, subd. 3; Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983).  A trade secret is information which both: (1) derives independent economic value from not being generally known or readily ascertainable through proper means by other persons who could obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain its secrecy.  Minn. Stat. § 325C.01, subd. 5(i-ii).  Misappropriation is defined as disclosure or use of a trade secret without express or implied consent by a person who, at the time of disclosure or use, knew that the utilization of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.  Minn. Stat. § 325C.01, subd. 3(ii).

Matson has adequately pleaded its misappropriation of trade secrets claim under MUTSA.  Matson has alleged that Smiens and Global's agency relationship gave it possession of sensitive, confidential information relating to Matson's operations, including customer lists, vendor lists, and cost and pricing information.  Compl. ¶ 54.  The Agent Agreement specified that this information was confidential, and Global and Smiens agreed not to disclose this

information.  Id. ¶ 55; Agent Agreement § 16.  Matson has alleged that Smiens used this confidential information to solicit and generate business for Trinity, that this confidential information was not readily ascertainable or generally known, and that the information had economic value because of its secrecy.  Compl. ¶¶ 57–59.  The facts also allege that armed with this information, Smiens has been able to recruit a substantial number of former Matson clients to Trinity.  Id.  ¶¶ 25–28.

Defendants argue that Hot Stuff Foods, LLC v. Dornbach, 726 F. Supp. 2d 1038 (D. Minn. 2010) is on point and weighs in favor of dismissing Matson's claim for failure to establish the existence of a trade secret.  In Hot Stuff Foods, the court determined that notwithstanding a nondisclosure agreement covering "confidential information," plaintiff's conclusory statements regarding that information was insufficient to show the existence of a trade secret.  Id. at 1044 ("Merely stating that the information is confidential is insufficient.").  Unlike the plaintiff in Hot Foods, Matson has alleged sufficient facts showing that the information was not generally known and had economic value because of its confidentiality.  Accordingly, Defendants' motion to dismiss this claim is denied.

### e.  Tortious Interference with Contractual Relationship and Prospective Advantage Claims against Lynch and Granite

Both parties agree that Minnesota law applies to Matson's tortious interference claims.  A plaintiff claiming tortious interference with a contractual relationship must show: (1) a valid contract; (2) that the defendant knew of the contract; (3) that defendant intentionally procured a breach of the contract without justification; and (4) that plaintiff suffered injuries as a direct result of the breach.  Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994).  "[M]erely entering into an agreement . . . is not tortious interference if [defendant] did nothing to induce" a breach

of the agreement.  <u>Salon 2000, Inc. v. Dauwalter</u>, No. A06-1227, 2007 WL 1599223, at *5

(Minn. Ct. App. June 5, 2007).  Moreover, the fact that a third party knew of a contract between

two parties is no bar to that third party entering into a second contract with one of the parties, as

long as that third party did nothing to induce a breach of the known prior contract.  <u>Snowden v.</u>

<u>Sorensen</u>, 75 N.W.2d 795, 799–800 (Minn. 1956).

 Matson's Complaint is meager in its facts alleging that Lynch and Granite procured

Smiens' breach of the Agent Agreement.  Although Matson alleges that "Lynch, Granite, and

Trinity each intentionally procured Smiens/Global's breach of its contract with Matson," Compl.

¶ 64, the factual allegations, taken in the light most favorable to Matson, are insufficient to

support its claim against Granite.  Specifically, Matson alleges no actions taken by Granite to

induce a breach of Smiens/Global's breach of the Agent Agreement.  Regarding Lynch,

Matson's Complaint alleges that Lynch attended the August 29, 2011 contract renegotiation

meeting between Smiens and Matson.  <u>Id.</u> ¶ 19.  Matson also alleges that Lynch worked with

Smiens to organize Granite to compete directly with Matson.  <u>Id.</u> ¶¶ 20–23.  While his

subsequent organization of Granite falls short of tortious interference, Lynch's presence at the

contract renegotiation meeting raises a factual issue as to whether he interfered with the Agent

Agreement.  Given that Lynch was an interested third party, and given that it was this failed

renegotiation that Smiens indicated to Matson was his reason for becoming an agent for Trinity,

<u>id.</u> ¶ 23, it is inappropriate to dismiss the claim of tortious contractual interference against Lynch

at this time.  However, because Matson's Complaint does not implicate Granite in the intentional

procurement of the breach, the tortious interference with a contractual relationship as to Granite

is dismissed.

Tortious interference with prospective advantage requires a plaintiff show the following elements: (1) the defendant intentionally and improperly interfered with the prospective contractual relationship; (2) causing pecuniary harm from the loss of the relationship's benefits; and (3) the interference either (a) induced or caused a third person not to enter into or continue the prospective relationship or (b) prevented the continuance of the prospective relationship. United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982).  Liability for this type of unfair competition claim only occurs where the actor's conduct is improper.  Fox Sports Net N., L.L.C. v. Minn. Twins P'ship, 319 F.3d 329, 337 (8th Cir. 2003).  "For purposes of this tort, improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law."  Harman v. Heartland Food Co., 614 N.W.2d 236, 241 (Minn. Ct. App. 2000) (quotation omitted).

Defendants Lynch and Granite argue that Matson has alleged no improper means with a purported economic advantage in alleging tortious interference with prospective advantage. Matson, citing no caselaw, argues that it has adequately alleged improper means by stating, "Lynch, Granite, and Trinity each intentionally and improperly procured Smiens/Global's breach of contract" and "The actions of Lynch, Granite, and Trinity in intentionally and improperly procuring Smiens/Global's breach of contract with Matson were not justified." Compl. ¶¶ 70–71. Although the parties had engaged in negotiations to renegotiate the Agent Agreement on August 29, 2011, the facts alleged do not suggest that Lynch interfered with the contract extension. Granite could not have interfered with the contract extension negotiations, as it was not incorporated until a week later, on September 7, 2011.  Compl. ¶¶ 19–20.  Because Matson has

failed to sufficiently allege that Granite improperly and intentionally procured the breach of

contract and because no facts have been alleged showing that the acts of Lynch or Granite were

the direct cause of Matson's and Global's failure to extend the contract term, Matson's claim for

tortious interference with prospective advantage is dismissed against Lynch and Granite.

### 3.  Trinity's Motion to Dismiss is Granted

Trinity moves to dismiss the two causes of action against it — the tortious interference of

a contractual relationship and tortious interference with prospective advantage claims.  For the

aforementioned reasons, Matson has failed to adequately allege facts supporting these claims

against Trinity.  Trinity's receipt of Matson's cease-and-desist letter on December 15, 2011,

occurred three days after Smiens and Global breached the contract with Matson and well after

Trinity and Granite had entered into a contract.  See Compl. ¶ 30(b).[1]  Matson urges this Court to

infer that Trinity had "constructive knowledge" of Smiens/Global's contract with Matson based

on Trinity's knowledge of the industry and Trinity's knowledge of the agents and customer base

that Smiens brought with him from Matson.  See Pl.'s Mem. in Opp'n to Trinity Mot. to Dismiss

[Docket No. 34] 7.

Matson cites Kallok v. Medtronic, Inc., 573 N.W.2d 356 (Minn. 1998) to support its

contention that interference is not justified when a "'defendant had knowledge of facts which, if

followed by reasonable inquiry, would have led to a complete disclosure of the contractual

relations and rights of the parties.'" Id. at 362 (quoting Swaney v. Crawley, 191 Minn. N.W.

583, 584 (1923)).   The Swaney court further states, "It is not necessary to prove actual

---

[1]The Complaint contains two paragraphs numbered "Paragraph 30."  For purposes of this
order, the first Paragraph 30 will be referred to as "Paragraph 30(a)," the second as "Paragraph
30(b)."

knowledge." Id. at 584.  This much is true.  However, Matson failed to include the requisite

facts to show that Trinity had knowledge of facts which would have led to its disclosure of

Matson's contract with Smiens/Global.  Both Kallok and Swaney stand for the proposition that a

party which has actual knowledge of an existing contract is not justified in tortiously interfering

with that contract if reasonable inquiry into that contract would have led to a complete disclosure

of the contractual provisions, rights, and liabilities.  Here, Matson has not alleged that Trinity

knew of the contract prior to December 15, 2011, three days after Smiens definitely breached the

contract by stating he and Global would no longer be bound by the terms of the Agent

Agreement.  Compl. ¶¶ 23–24, 30(b).  Accordingly, Matson has failed to plead facts sufficient to

support its claim of tortious interference with contractual relations by Trinity.

Moreover, Matson has failed to alleged facts sufficient to show that Trinity intentionally

procured the breach, citing only facts that arguably support a finding that Trinity continued a

breach which had already occurred.  See Compl. ¶ 30(b).  Even if Matson had adequately

alleged that Trinity actually knew of the Agent Agreement, "[t]he mere fact that they knew of the

first contract would be no bar to either of them entering into a second contract with [Smiens],

providing they did nothing to induce [Smiens] to breach the prior contract."  Snowden, 75

N.W.2d at 799–800.  "It is, of course, essential that some acts of the defendants were the

proximate cause of the breach.  It is not enough that the defendants merely knew of the

contractual relationship and obtained its benefits for themselves."  Royal Realty Co. v. Levin, 69

N.W.2d 667, 672 (Minn. 1955) (footnote omitted).  Here, except for the conclusory allegation

that Trinity "intentionally procured Smiens/Global's breach of contract with Matson," Compl. ¶

64, Matson has failed to allege any facts to support this essential element of a claim for tortious

interference with contractual relations.  For this reason, Matson's claim is dismissed.

Similarly, Matson's claim for tortious interference with prospective advantage against

Trinity fails for the aforementioned reasons set forth in Section III(B)(2)(e); namely, that Matson

has alleged no facts showing improper means or intentional procurement with a purported

economic advantage in its tortious interference with prospective advantage claim.  Therefore,

this claim also is dismissed.

### C.  Matson's Preliminary Injunction Motion

#### 1.  Standard of Review

Preliminary injunctive relief is an extraordinary remedy.  See Cargo Protectors, Inc. v.

Am. Lock Co., 92 F. Supp. 2d 926, 929 (D. Minn. 2000).  In considering a preliminary

injunction, courts apply the factors set forth in Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d

109 (8th Cir. 1981): (1) threat of irreparable harm to the movant; (2) harm to other parties if the

relief is granted; (3) probability of movant's success on the merits; and (4) effect on public

interest.  Id. at 113.[2]  The fundamental question "is whether the balance of equities so favors the

movant that justice requires the court to intervene to preserve the status quo until the merits are

determined."  Id.  The movant "bears the burden of establishing the necessity of this equitable

remedy."  Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

No Dataphase factor is dispositive; instead, each factor is to be considered when

determining the balance of equities.  United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179

(8th Cir. 1998).  A movant is required to show the first factor, threat of irreparable harm; a

---

[2]No party disputes that Dataphase controls Plaintiff's PI Motion.  See Defs.' Mem. in
Opp'n to PI Motion [Docket No. 29] 16; and Pl.'s Mem. in. Supp. of PI Motion [Docket No. 8]
20.

motion for preliminary injunction fails without this factor.  Dataphase, 640 F.2d at 114 n.8.

### 2.  Matson's PI Motion

Matson argues that it is entitled to preliminary injunctive relief against Defendants Smiens, Global, and Granite.  Global has not filed any opposition to the PI Motion.  Trinity has joined with Smiens and Granite's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction [Docket No. 29], but Matson does not seek injunctive relief against Trinity.  Based on the discussion below, Matson's PI Motion is denied.

### a.  Threat of Irreparable Harm

Irreparable harm is shown if a party establishes that "the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  Iowa Utils. Bd. v. F.C.C., 109 F.3d 418, 425 (8th Cir. 1996).  "[P]otential loss of consumer goodwill qualifies as irreparable harm."  Id. at 426.  A presumption of irreparable harm exists where a "professional employee[] . . . acquire[s] a personal influence over patients or clients of their employer."  Rosewood Mortg. Corp. v. Hefty, 383 N.W.2d 456, 459 (Minn. Ct. App. 1986).  Additionally, courts will look to express agreements in determining threat of irreparable harm.  See, e.g., Life Time Fitness, Inc. v. DeCelles, Civ. No. 12-420, 2012 WL 639453, at *3 (D. Minn. Feb. 28, 2012) (finding irreparable harm where the parties' employment agreement explicitly stated that "immediate irreparable damage will result to [Plaintiff] if [the] employee breaches any of the covenants set forth in this Agreement").  In Minnesota, an inference of irreparable harm arises from the breach of a valid non-compete agreement.  See Overholt Crop Ins. Serv. Co. v. Bredeson, 437 N.W.2d 698, 701 (Minn. Ct. App. 1989); Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085, 1091 (D. Minn. 1981), aff'd, 684 F.2d 565 (8th Cir. 1982).

Determining the threat of irreparable harm is a prospective analysis — the threatened harm must be future injury, not merely past harm.  Where the alleged harm has already occurred and the harm can be adequately remedied through monetary damages, a preliminary injunction is not appropriate.  Cf. CDI Energy Servs., Inc. v. West River Pumps, Inc., 567 F.3d 398, 403 (8th Cir 2009) (affirming the denial of a preliminary injunction where past harm made it "not entirely clear how injunctive relief would actually assist [Plaintiff] in any manner.").

The lack of Matson's showing of a threat of irreparable harm is determinative here.  In disputes, such as this, which arise out of a breach of a restrictive covenant, irreparable harm can be inferred.  Moreover, here the Agent Agreement expressly contemplated that any breach would result in irreparable harm.  See Agent Agreement § 4 ("[A]ny violation of this Agreement will result in irreparable harm to [Matson] for which there is no remedy at law. . . .").  Therefore, an inference of irreparable harm is appropriate.

The duration of Matson's delay alone does not overcome this inference of irreparable harm.  Matson waited more than two months after Smiens alerted Matson he would be working as an agent for Trinity — December 12, 2011 — to file its PI Motion on February 23, 2012.  This amount of delay may be indicative of a lack of irreparable harm, but it alone does not preclude a finding of irreparable harm.  See, e.g., Travel Tags, Inc. v. UV Color, Inc., 690 F. Supp. 2d 785, 802 (D. Minn. 2010) (stating that evidence of delay does not preclude, as a matter of law, a determination of irreparable harm).

However, the harm that Matson alleges is a past, not a future, injury that can be appropriately remedied through monetary damages.  Matson alleges that "Smiens is now soliciting and otherwise servicing Matson's customers on behalf of Matson's competitor,

26

Trinity," but in the very next sentence Matson avers that "[a]ll of the customers with whom Smiens forged relationships for and on behalf of Matson are now moving freight with Trinity because of Smiens."  Pl.'s Mem. in Supp. of PI Mot. 17.  Given that Smiens is alleged to have taken all his "Matson" customers to Trinity, it is unclear what future injury is threatened which would warrant a finding of irreparable future harm.  Further, the monetary damages can be adequately calculated based on each customer's contract and business history with Matson.  See Cargo Protectors, Inc., 92 F. Supp. 2d at 935; see also GreatAmerica Leasing Corp. v. Dolan, Civ. No. 10-4631, 2011 WL 334829, at *3 (D. Minn. Jan. 31, 2011) (finding no irreparable harm in part because "any customers lost can be identified and the amount of business gained from those customers can be quantified").  Therefore, Matson has not established a threat of irreparable harm, and this Dataphase factor weighs against injunctive relief.  Because a movant is required to show the threat of irreparable harm, Dataphase, 640 F.2d at 114 n.8., Matson's PI Motion is denied.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Matson's Motion for Preliminary Injunction [Docket No. 6] is **DENIED**;

2. Defendant Trinity's Motion to Dismiss [Docket No. 16] is **GRANTED**;

3. Defendants Smiens, Lynch, and Granite's Motion to Dismiss [Docket No. 18] is **GRANTED** in part and **DENIED** in part; and

4. Count 1 of Matson's Complaint [Docket No. 1] is **DISMISSED** as to

Smiens and Granite;

5.    Count 5 of Matson's Complaint [Docket No. 1] is **DISMISSED** as to

Granite and Trinity; and

6.    Count 6 of Matson's Complaint [Docket No. 1] is **DISMISSED**.


BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 5, 2012.