UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Matson Logistics Services, LLC,
f/k/a Matson America Transportation
Services, LLC,

                Plaintiff,           **MEMORANDUM OPINION AND ORDER**

                v.                        Civil No. 12-400 ADM/JSM

Jeffrey D. Smiens; Patrick E. Lynch;
Global Logistics, LLC; Granite
Logistics Services, LLC; and Trinity
Logistics, Inc.,

                Defendants.

_____

Eric K. Habig, Esq., Braden K. Core, Esq., and Andrew F. Marquis, Esq., Scopelitis, Garvin, Light, Hanson & Feary P.C., Indianapolis, IN; and Mark J. Ayotte, Esq., and Kevin M. Decker, Esq., Briggs & Morgan, P.A., Minneapolis, MN, on behalf of Plaintiff.

Joseph W. Hammell, Esq., Christopher Amundsen, Esq., and Jen Cornell, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Defendants Jeffrey D. Smiens, Patrick E. Lynch, and Granite Logistics Services, LLC.

Kelly W. Hoversten, Esq., and Andrew J. Steil, Esq., Gray, Plant, Mooty, Mooty, & Bennett, P.A., St. Cloud, MN, on behalf of Defendant Global Logistics, LLC.

David R. Crosby, Esq., and Adine S. Momoh, Esq., Stinson Leonard Street LLP, Minneapolis, MN, on behalf of Defendant Trinity Logistics, Inc.

_____

## I. INTRODUCTION

On November 6, 2013, the undersigned United States District Judge heard oral argument on Plaintiff Matson Logistics Services, LLC's ("Matson") Motion for Summary Judgment [Docket No. 160] ("Plaintiff's Motion") on Counts I, II, and V of its Amended Complaint. The Court also heard oral argument on Defendant Trinity Logistics, Inc.'s ("Trinity") Motion for Summary Judgment [Docket No. 165] ("Trinity's Motion"), Defendant Global Logistics, LLC's

("Global") Motion for Summary Judgment [Docket No. 142], and Defendants Jeffrey D. Smiens ("Smiens"), Patrick E. Lynch ("Lynch"), and Granite Logistics Services, LLC's ("Granite") Motion for Summary Judgment [Docket No. 150]. For the reasons discussed below, the parties' motions for summary judgment are denied.

## II. BACKGROUND[1]

Much of the domestic freight trucking industry is composed of for-hire trucks and private shipper-owned fleets. Transportation brokers, also known as logistics brokers or trucking freight brokers, match for-hire transportation or trucking companies with customers. Transportation brokers help facilitate logistics, and when needed, serve as a liaison or mediator between the shipper customer and the transportation company. One of the key services a transportation broker provides is credit limit analysis of shipping customers, evaluating a customer's ability to pay for the shipment of its goods.

Matson and Trinity are transportation broker companies. Am. Compl. [Docket No. 80], at ¶¶ 1, 6, 9. Matson and Trinity market their services to shippers through their direct sales force and through independent brokerage agents located throughout the country. Independent brokerage agents and independent brokerage firms usually sign "agent agreements" with Matson and Trinity to govern the terms of their business relationship.

**A. Smiens' and Global's Agent Agreements with Matson**

In January 2011, Smiens became an independent agent of Matson. In April 2011, before incorporating Global, Smiens signed a second agent agreement with Matson in his personal

---

[1] Reference to the Court's June 5, 2012 Order may be helpful to the understanding of the parties' relationships. Matson Logistics, LLC v. Smiens, No. 12-400, 2012 U.S. Dist. LEXIS 77454, at *2-5 (D. Minn. June 5, 2012).

capacity. Smiens Decl. Supp. Global's Mot. Summ. J. [Docket No. 149] ("Smiens Decl."), at ¶¶ 2-3; Braden K. Core Decl. [Docket No. 163] Ex. A-8, at MAT000218-224. The second agreement provided that Smiens would receive a 65-70% commission on brokered shipments Smiens made. Core Decl. Ex. A-8 at MAT000218. Smiens incorporated Global in April 2011, and then on June 1, 2011, Matson signed a third agent agreement recognizing Global's incorporation and Smiens as Global's owner. Id. at MAT000225-232 (the "Agent Agreement"). The Agent Agreement raises commissions to 70-75% on brokered shipments. The Agent Agreement further provides the Agent must abide by Matson's credit limit calculations for prospective shippers, making the Agent "liable for all uncollected billing that is over the limits set by Matson." Id. at MAT000226.

Central to the dispute in this case, the Agent Agreement has a "Term and Termination" clause which provides:

> The term of this Agreement shall be five (5) years from the Effective Date and will renew automatically for additional one (1) year terms unless terminated by either party by providing written notice to the other party at least one hundred and twenty (120) days prior to the end of the then-current term. If Agent provides one hundred and twenty (120) days prior written notice of its intent to terminate this Agreement, as set forth above, Agent shall continue fulfilling its duties at a level of service satisfactory to Matson America during the entire one hundred and twenty (120) day notification period, which shall include, but not be limited to, Agent's cooperation in resolving accounting, billing and collection matters.

Id. at MAT000227.

The contract also addresses confidential information, requiring the Agent "not disclose to anyone during or after the term of this Agreement confidential information received from Matson America or developed by Agent in performing the Services." Id. at MAT000227. The contract includes, as confidential information, cost and pricing information, Matson customer

3

lists, and vendor lists. Id. Finally, Global agreed to protect Matson's confidential information according to a Nonsolicitation and Nonrecruitment attachment. Id. at MAT000230. The Nonsolicitation section provides:

> The Agent agrees that during the term of the Agreement, and for a period of one hundred eighty (180) days following the termination of the Agreement for any reason, the Agent will not, directly or indirectly, either individually or as a principal, partner, agent, consultant, contractor, [or] employee . . . solicit business, or attempt to solicit business, in products or services competitive with products or services sold by [Matson]. . . . [T]his Nonsolicitation provision will not apply to those customers listed [by Global].

Id. Smiens argues he and Matson's representatives had an understanding that Smiens did not need to list customers to which the provision would not apply because Smiens was told that the provision would not apply to any of his current customers. Smiens Decl., at ¶ 4. Matson claims it did not release Global from the Nonsolicitation provision. And because Global did not list any clients, Global and Smiens were not permitted to solicit any Global/Matson clients for competitors. Pl.'s Mem. Supp. Partial Summ. J. [Docket No. 161], at 5.

**B. Smiens, Lynch, and Trinity**

In the summer of 2011, Smiens was disappointed with the Global business. Smiens claims he unilaterally decided to terminate Global's relationship with Matson. Smiens contends he was not encouraged, induced, or persuaded by Lynch or Trinity to end Global's relationship with Matson. To the contrary, Matson argues Lynch and Trinity actively interfered with Smiens and Global's contractual relationship with Matson.

Lynch is an experienced transportation broker. In 2006, Lynch sold his former agency to another broker. As part of the sale, Lynch agreed to a five year noncompetition agreement.

Trinity and Matson are competitors in the same transportation brokerage business. Core

Decl. Ex A-8, MAT000594-603. Matson and Trinity employees have recruited agents from each other. Id. One such employee, Dan Scales, was a former Matson employee who went to work with Trinity. Matson believes Scales routinely recruited Matson agents for Trinity. Matson and Trinity discussed the matter in 2009 and informally agreed Scales would no longer contact Matson agents. Id.

In 2011, Lynch's noncompetition agreement had expired, allowing him to pursue brokering transportation again. Smiens and Lynch began communicating about Smiens' business, Global, and the possibility of Lynch working with Smiens. Core Decl. Ex. A-9, GSL 000079, GSL 000254-266. In July and August, 2011, Global attempted to renegotiate the Agent Agreement with Matson. Lynch and Smiens came to an August meeting between Global and Matson with a red-lined copy of the Agent Agreement, marking areas they thought should be changed, including an increase in commissions. Mark Christos Supp. Decl. [Docket No. 46] Ex. B, ¶ 30. Matson responded to the red-lined proposal ("October Proposal") by attempting to include early termination penalties. Ultimately, negotiations were unsuccessful and Matson, Smiens, Lynch, and Global did not agree to a new contract.

On October 3, 2011, Lynch and Smiens incorporated Granite. Core Decl. Ex. A-9, at GSL 000315-318. Prior to incorporating Granite, Lynch claims he did not join Global. Although arguing Lynch did not join Global, Smiens emailed Lynch Smiens' personal login and password to access Matson's MILO system. Id. at GSL 000258. Smiens encouraged Lynch to explore MILO. Matson claims that MILO is a proprietary database that houses its confidential information, including customer lists, pricing lists, and customer credit risk analysis. As an agent of Matson, Smiens adopted an @matsonits.com email address. Core Decl. Ex. A-9. By

November 2011, Lynch had also adopted an @matsonits.com email address, which he used in communication with Trinity employee Scales. Id. at GSL 000366.

In his deposition, Scales could not remember whether, in October or November of 2011, he contacted Lynch or Lynch contacted him. Id. Ex. A-6 (Scales Dep.), at 31-33. Regardless, Scales had a conference call with both Lynch and Smiens. Id. at 36. Scales asked if Lynch and Smiens were parties to "some kind of no-compete or no back solicitation that would cause [Trinity] to become a litigant if [they] did business." Id. at 37. Lynch told Scales, "Dan, when you were [at Matson], you wrote all these contracts; you probably would know that better than me." Id. Trinity claims Scales took Lynch's answer to mean that Smiens and Lynch were not subject to a noncompetition and nonsolicitation agreement. Trinity claims Scales did not think he needed to follow up or ask any further questions. Matson argues Scales and Trinity knew Matson agents have noncompete agreements and should have known to inquire further.

In November of 2011, Trinity met with Smiens and Lynch and agreed to do business. Id. Ex. A-10. Matson now claims that Smiens and Lynch sent Trinity confidential information, including the identities of Matson's shippers Global was then serving; the revenue figures associated with those shippers; and the credit limits Matson had set for those shippers.

Smiens informed Matson that Global was terminating its business with Matson on December 12, 2011. Matson claims it only found out about the termination when Mark Christos, a vice-president of operations from Matson, called Smiens' Global office number and an employee answered the phone informing Christos that he had reached Trinity. The Trinity employee connected Christos with Smiens, whereupon Smiens informed Matson of the termination. Christos Decl. ¶¶ 31-32.

## C. Global, Smiens, and Transition to Granite

Matson claims that to the extent Global is found liable in this action, Smiens and Granite are also liable because Global was Smiens' alter ego and Granite is Global's successor in liability. Matson cites tax records, deposition testimony, bank account information, phone records, email messages, the overlap of Granite and Global office space and employees, and other documents which Matson claims show Smiens, Global and Granite were operating together. Core Decl. Ex. A-11; Pl.'s Mem. Opp'n to the Mot. Summ. J. by Defs. Smiens, Lynch, and Granite [Docket No. 180], at 6-14. Smiens argues Matson is misinterpreting all of these records and that the records actually prove Smiens, Global, and Granite were separate entities. Global argues that it is independent of Smiens and that Granite is a new business venture also appropriately separate from Global. Smiens and Granite thus contend that any liability for a breach of contract must be limited to Global.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted). However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary

judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).

**B. Breach of Contract - Global**

Matson and Global both seek summary judgment on Matson's claim that Global breached the Agent Agreement.

A breach of contract claim in Ohio is established by a preponderance of the evidence when a plaintiff proves "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff."[2] Savedoff v. Access Grp., Inc., 524 F.3d 754, 762 (6th Cir. 2008) (quoting Jarupan v. Hanna, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007)). "A party breaches a contract if it fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions. Id. "In construing the terms of any contract, the principal objective is to determine the intention of the parties." Hamilton Ins. Servs. v. Nationwide Ins. Cos., 714 N.E.2d 898, 900 (Ohio 1999).

"If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. Inland Refuse Transfer Co. v. Browning-Ferris Indus., Inc., 474 N.E.2d 271, 272 (Ohio 1984); see Beasley v. Monoko, Inc., et al., 958 N.E.2d 1003, 1011 (Ohio Ct. App. 2011). "On the other hand, where a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent." Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1261 (Ohio 2003). If the intent of the parties is still unclear or ambiguous after considering extrinsic evidence, then "it is generally the role of the finder of fact to resolve

---

[2] In accordance with the Court's choice of law analysis, the breach of contract claim is analyzed under Ohio law, while the remaining claims are analyzed under Minnesota law. Matson Logistics, 2012 U.S. Dist. LEXIS 77454, at *11.

ambiguity." Id.

### 1. Termination Clause

Global argues that the plain language of the Termination clause allows either party the right to cancel the Agent Agreement at any time, as long as notice was delivered at least 120 days before the end of the then-current term. According to Global's view, the then-current term includes the initial five year term. Therefore, when Global terminated the contract on December 12, 2011, still in the first term, Global gave Matson much more than the 120-day notice for termination.

Matson also argues the Agent Agreement is clear; the Termination clause requires Global to complete its initial five-year term and then the Agreement can be terminated with 120-day notice before the automatic renewal of additional one-year terms. Therefore, when Global terminated the agreement, still in the first term, Global was automatically in violation of the agreement, which did not allow for any termination in the first term.

The different interpretations of the "plain" language suggest it is not plain but rather ambiguous. Global's interpretation would render meaningless the word "terms," both in the "five-year term" and the additional "one-year terms." If the parties intended to allow for the efficient closure of the relationship, all the contract would have needed to say is the contract terminates with 120-day notice. Matson's interpretation is also problematic because it requires the Court to ignore the word "term," but only for the initial five-year term. The language of the clause makes no such distinction. It simply states that the contract may terminate 120-days before the close of the "then-current term," which could include the initial five-year term. The Court finds that the termination clause of the Agent Agreement is therefore ambiguous.

**2. Presumption Against Contract Drafter and Extrinsic Evidence of Early Termination**

Global argues that even if the Agent Agreement is found ambiguous, the Court should still grant summary judgment in Global's favor because the contract should be construed against the drafter and the extrinsic evidence from depositions indisputably proves that Matson allowed other agents to terminate their relationship at any time, even during the initial term.

At summary judgment, only if the contract is "standardized and between parties of unequal bargaining power" will an ambiguity be construed by the court against the drafter and in favor of the nondrafting party. Galatis, 797 N.E.2d at 1261; see also Davis v. Loopco Indus., Inc., 66 Ohio St. 3d 64, 65-66 (Ohio 1993). Here, there is insufficient evidence on the record to establish the relative bargaining positions of the parties. Additionally, although the Agent Agreement appears to be a modified form contract, it is not standardized because some negotiating occurred on issues such as the amount of commissions and possibly concerning which customers, if any, would be excluded from the nonsolicitation provision. For these reasons, whether the contract should be construed against Matson as the drafter of the contract is not certain.

Second, the extrinsic evidence presents disputed issues of fact that preclude granting summary judgment. The extrinsic evidence on the record thus far establishes a vigorous debate about the intentions of the parties. Global asserts that it had a right to terminate the Agent Agreement in December 2011 based on extrinsic evidence regarding: (1) negotiations between Matson and Granite; (2) Matson's prior treatment of other agents; and (3) mutual termination of prior agreements between Smiens and Matson. As to negotiations between Matson and Granite,

Global argues efforts by Matson to include early termination penalties in the October Proposal shows the Agent Agreement, without such provisions, anticipated early termination. But Matson argues the October Proposal merely made explicit its understanding of the contract already in force with Global. Furthermore, Matson and Global have similar disputes about Matson's prior treatment of other agents and Matson argues mutual termination of prior agreements is irrelevant to a unilateral termination of the Agent Agreement. These arguments make the parties' intentions a disputed question of fact for jury resolution.

### 3. Minimum Brokerage Requirement

Global argues that even if Matson's interpretation of the termination clause is correct, Global nevertheless did not breach the Agent Agreement because Global had no minimum requirement to broker shipments. Matson argues Global had a duty of good faith and fair dealing to attempt to broker loads for Matson. In Ohio, there is a common law duty of good faith which is implied in the performance of most contracts. Stars of Cleveland, Inc. v. Fred Martin Dodge Suzuki, Inc., 2009-Ohio-4012, *P41 (Ohio App., Aug. 10, 2009); Brown v. Otto C. Epp Mem'l Hosp., 41 Ohio App. 3d 198, 199 (Ohio App., 1987). By analogy to REDOT Dev. of Ohio, LLC v. Waste Mgmt. of Ohio, 2013-Ohio-2364 (Ohio App., June 7, 2013), Global argues it had no obligation to broker any loads because the Agent Agreement does not set a minimum load requirement. In REDOT the court found indisputable evidence that the parties had explicitly negotiated and rejected a minimum loads requirement. Based on the evidence of the parties' negotiations, the court in REDOT granted summary judgment in favor of the company that refused to make deliveries. There is no similar record of negotiation here.

Matson cites Illinois Controls, Inc. v. Langham, 639 N.E.2d 771, 778-79 (Ohio 1994), for

11

the proposition that Global clearly breached its duty to make reasonable efforts when it refused to broker loads during the 120-day notice period. <u>Illinois Controls</u> holds that a "contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to generate sales of the product." <u>Illinois Controls</u> does not describe the circumstances here. In this case, Matson is providing services that purport to help Global find and manage customers, for the benefit of Matson and Global. Global does not, on the face of the Agent Agreement, have an exclusive right to market Matson products to customers. Instead, Global agreed to use Matson's services to broker loads in exchange for a share of the profits from these brokerages.

    Neither parties' case law is dispositive. Whether Global honored the Agent Agreement's good faith and fair dealing requirement before and during the 120-day notice period will largely turn on the intent of the parties at the time the contract was made. The language of the Agreement's termination clause is ambiguous and the contract is silent on load expectations; therefore, the question of fair dealing cannot be decided upon the parties' motions for summary judgment.

    **4. Nonsolicitation and Confidential Information**

    Global disputes it shared confidential Matson information with Trinity. Global also disputes it solicited any Matson customers on behalf of Trinity. Even if Smiens and Lynch did disclose confidential information or solicit Global and Matson's former clients Global argues, Global cannot be held accountable for Smiens and Lynch's conduct because Smiens and Lynch were not parties to Global's agreement with Matson. Global appears to base this view on the motion to dismiss ruling rendered earlier in this case. See <u>Matson</u>, 2012 U.S. Dist. LEXIS

77454, at *14-15. The Court ruled Matson could not sustain a breach of contract claim against Smiens and Lynch based on the Agent Agreement. But Global conflates liability for breach of contract with being subject to the terms of a contract.

Global, a limited liability company, can only act through its employees or agents. Malone v. Courtyard by Marriott Ltd. P'ship, 95 Ohio App. 3d 74, 89 (Ohio App. 1994). If Smiens is found to have shared confidential information or solicited clients while representing Global and Matson, Global may be held liable for breach of the Agent Agreement. Since there is an ongoing dispute about whether the nonsolicitation provision covered clients Smiens did business with before he created Global and before Global signed the Agent Agreement, and since it is unclear based on the record whether the information Smiens shared with Lynch and Trinity was confidential, summary judgment is not appropriate at this time.

**C. Misappropriation of Trade Secrets by Global**

Under the Minnesota Uniform Trade Secrets Act ("MUTSA"), companies are prohibited from the improper acquisition, disclosure, or use of a trade secret. See Minn. Stat. § 325C.01, subd. 3; Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983). A trade secret is information which both: (1) derives independent economic value from not being generally known or readily ascertainable through proper means by other persons who could obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain its secrecy. Minn. Stat. § 325C.01, subd. 5(i)-(ii). Misappropriation of a trade secret is defined as disclosure or use of a trade secret without express or implied consent by a person who, at the time of disclosure or use, knew that the utilization of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Minn. Stat. §

325C.01, subd. 3(ii).

Global argues Matson failed to properly allege a MUTSA claim. Matson responds that it has claimed, with evidentiary support, Smiens gave Lynch access to Matson's password protected MILO database, which contains the identities of Matson's shippers, the revenue figures associated with those shippers, and the credit limits Matson has set for those shippers. Matson has also alleged that Smiens and Lynch, using Matson email addresses and acting as agents of Global, sent Trinity at least a portion of this information. Matson claims the credit limits for its shipping customers in particular is not generally known or readily ascertainable. Therefore, Global has not shown by undisputed facts that it is entitled to summary judgment as a matter of law. Matson's MUTSA claim survives the summary judgment motion.

**D. Piercing the Corporate Veil**

"Piercing the corporate veil is an equitable remedy that may be applied in order to avoid an injustice." Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009). "A court may pierce the corporate veil to hold a party liable for the acts of a corporate entity if the entity is used for a fraudulent purpose or the party is the alter ego of the entity." Id. Under the alter ego theory of veil piercing, courts analyze the reality of corporate governance, not the form, examining the way the corporation actually operated and how the individual defendant related to that operation. Id.

Minnesota courts apply a two-prong test to determine whether a shareholder may be liable for corporate obligations. The first prong focuses on the shareholder's relationship to the corporation, taking into account the following factors: (1) insufficient capitalization of the corporation; (2) failure to observe corporate formalities; (3) failure to pay dividends; (4)

insolvency of the debtor corporation at time of transaction; (5) siphoning of funds by the dominant shareholder; (6) non-functioning of other officers and directors; and, (7) lack of corporate records; (8) existence of the corporation as a facade for individual dealings. Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979). The second prong requires proof that veil piercing is necessary to avoid injustice or fundamental unfairness. Id. When applying this doctrine, "courts are concerned with the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." Id.

The parties have filed cross motions for summary judgment on whether Global is an alter ego for Smiens. Neither party has established the facts sufficient to warrant summary judgment. See Ahlm v. Rooney, 143 N.W.2d 65, 69 n.1 (Minn. 1966) (noting that, at summary judgment stage, alter ego claims usually should not be disposed of due to the complex issues involved). The parties vigorously debate all the factors for veil piercing. Matson claims Smiens' use of corporate funds shows that Smiens abused Global's corporate form. Matson claims Smiens wrote himself and his wife checks from the corporate account and debited personal purchases on the corporate account. Matson argues that this shows siphoning of funds by the dominant shareholder. Smiens argues that these purchases were part of his compensation and were too small to be considered siphoning in any event. Smiens also claims this compensation was appropriately reflected on his tax returns. Matson argues that although Global had its own bank account, Global largely failed to respect corporate formalities. Smiens' personal address was used to open the account and for all correspondence. Matson also points to Smiens' tax return for 2011 to argue that Smiens' relationship with Matson was reported there and Global has not offered a corporate tax filing. Furthermore, Matson notes Smiens, not Global, payed rent for

Global's office and Smiens was listed as the tenant of the lease agreement.

To show fundamental unfairness, Matson argues Smiens abandoned Global and moved all of his funds, employees, and assets from Global to Granite to avoid responsibility for the contract Global had with Matson. Matson argues this is exactly the type of "constructive fraud" and unjust behavior the law is designed to prevent. Smiens argues Matson agreed to deal with Global and abrogated its relationship with Smiens. In addition, when Matson wanted extra assurances on credit risky customers, Matson would require Smiens to sign additional agreements placing Smiens' personal assets at risk if the customer defaulted. Smiens argues that Matson recognized that Global protected Smiens from personal liability. Since, the second prong, like the first prong, relies largely on fact finders' decisions about which party is accurate in their characterizations of competing facts, summary judgment shall not be granted to either party.

**E. Successor Liability**

Granite has moved for summary judgment on Matson's claim that Granite is a successor in liability to Global. In its Motion to Dismiss Order, the Court allowed Matson to proceed with its successor liability claim because:

> Matson's Complaint has pleaded fraud with the required specificity. Matson alleges that Smiens, on behalf of Granite, failed to disclose Granite's filing of Articles of Organization with the Minnesota Secretary of State from September 7, 2011, to October 11, 2011. Furthermore, the Complaint alleges that Granite, through Smiens, informed Matson that it was incorporated simply to formalize a joint business venture, when in fact Matson alleges Granite was acquiring the assets and employees of Global to serve as an agent for a Matson competitor, Trinity. Matson further alleges that Granite accomplished this fraud by disguising its activity by using the same emails, phone numbers, and employees as Global from October to early December 2011. These facts sufficiently state the "who, what, when, where, and how" of the alleged fraud, and therefore Matson's claim for successor liability against Granite survives this Motion to Dismiss solely on the fraud exception.

Matson, 2012 U.S. Dist. LEXIS 77454, at *27-28 (citations omitted).  Matson has since provided further evidence that Smiens and Lynch used Matson's name in their email addresses, arguably suggesting that they were Matson employees even during the time that Granite was allegedly hiring Global employees and when Grantie was buying assets from Global and Smiens.   Granite disputes Matson's characterization of the transition from Global to Granite, but Granite has not shown with undisputed facts that Granite is entitled to summary judgment.

**F.  Tortious Interference with Contractual Relationship**

Matson moves for summary judgment on its claim that Lynch and Trinity tortiously interfered with Matson's contractual relationship with Global.  Lynch and Trinity move for summary judgment that Matson cannot prove the elements of tortious interference.

A claim for tortious interference requires the establishment of five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."  Kallok v. Medtronic, Inc., 573 N.W.2d 356, 362 (Minn. 1998) (citation omitted).

**1.  Lynch**

The first two elements are satisfied, as the Agent Agreement is the contract, and Lynch was aware of the existence of this contract.  Lynch and Smiens presented a red-lined version of the contract in an effort to negotiate a new deal with Lynch, Smien, and their new venture Granite.  Whether Lynch intentionally procured a breach in the contract is disputed by the parties.  Smiens claims that he pursued Lynch, attempting to hire him first to Global and then creating Granite with him.  Matson claims Lynch convinced Smiens to abandon Global for Granite and a better contract with Trinity.  There is deposition testimony supporting both

positions.  This is a key factual issue that remains in dispute.  Thus, summary judgment is denied as to the tortious interference claim against Lynch.

### 2. Trinity

Trinity also acknowledges that the Agent Agreement is a contract.  It denies however that it was aware or had knowledge of the contract.  "It is not necessary to prove actual knowledge; it is enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and the rights of the parties."  Swaney v. Crawley, 154 Minn. 263, 265 (Minn. 1923); see Kallok, 573 N.W.2d at 363.  Matson argues that when Dan Scales, a recruiter for Trinity, asked Smiens and Lynch if they had any agreements with Matson that would prevent Trinity from recruiting them, he did not make a further reasonable inquiry when they told Scales he should know.  Trinity argues that Scales reasonably assumed Lynch and Smiens were not parties to a noncompete agreement because when he was at Matson, Scales did not remember having noncompete agreements.  But, Scales was concerned enough about noncompete agreements to ask the initial question.  It is unclear why he did not ask a follow up question when he received the ambiguous answer.  As the key figure in the 2009 dispute between Matson and Trinity about Scales recruiting Matson agents, Scales was alert to the fact that Matson would want to protect its interest in its agents by requiring them to sign noncompete agreements.  What Scales knew or reasonably should have known is a disputed fact for the jury.  The remaining factors of intentional procurement, without justification, and damages are equally disputed.

**G. Civil Conspiracy**

Trinity moved for summary judgment on Matson's civil conspiracy claim. Trinity argues it cannot be liable for conspiracy because it did not commit tortious interference. Since Trinity is not entitled to summary judgment on the tortious interference claim, it is not entitled to summary judgment on the civil conspiracy claim.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Matson Logistics, LLC's Motion for Summary Judgment [Docket No. 160] is **DENIED**;

2. Defendant Global Logistics, LLC's Motion for Summary Judgment [Docket No. 142] is **DENIED**;

3. Defendants Jeffrey D. Smiens, Patrick E. Lynch, and Granite Logistics, LLC's Motion for Summary Judgment [Docket No. 150] is **DENIED**; and,

4. Defendant Trinity Logistics, Inc.'s Motion for Summary Judgment [Docket No. 165] is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  February 27, 2014.